ORIGINAL

Approved: _____
CHRISTOPHER J. DIMASE / SARAH PAUL
Assistant United States Attorneys

Before: HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

**16 MAG 3998**

- - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA          :   **SEALED COMPLAINT**
                                  :
       - v. -                     :   Violations of
                                  :   18 U.S.C. § 1347,
                                  :   42 U.S.C. § 1320a-7b
SAJID JAVED,                      :
                                  :   COUNTY OF OFFENSE:
       Defendant.                 :   BRONX
                                  :
- - - - - - - - - - - - - - - - x

COUNTY OF NEW YORK         )
STATE OF NEW YORK          ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

U.S. DISTRICT COURT FILED JUN 21 2016 S.D. OF N.Y.

ARTHUR LEPORE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Health Care Fraud)

1. From at least in or about January 2013, up to and including at least in or about July 2015, in the Southern District of New York and elsewhere, SAJID JAVED, the defendant, willfully and knowingly, did execute and attempt to execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items and services, to wit, JAVED sought reimbursement from Medicare and Medicaid for prescription drugs that were never distributed to customers.

(Title 18, United States Code, Sections 1347 and 2.)

1

**COUNT TWO**
(Illegal Remuneration)

2. From at least in or about March 2015, up to and including at least in or about April 2015, in the Southern District of New York and elsewhere, SAJID JAVED, the defendant, willfully and knowingly, did offer and pay remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to persons to induce such persons to refer individuals to persons for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, to wit, JAVED offered to pay, and in fact paid, kickbacks to other individuals to obtain prescription drugs that were reimbursable by Medicare and Medicaid.

(Title 42, United States Code, Section 1320a-7b(2).)

The bases for my knowledge of the foregoing charges are, in part, as follows:

3. I have been a Special Agent with the FBI for approximately 7.5 years. I am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs. During my tenure with the FBI, I have participated in a variety of health care fraud investigations, during the course of which I have interviewed witnesses and subjects, organized undercover operations, conducted physical surveillance, executed search warrants, reviewed Medicare and Medicaid claims data, bank records, phone records, Medicare and Medicaid beneficiaries' medical records, invoices, and other business records. I am familiar with the records and documentation maintained by pharmacies, the methods of payment for prescriptions, and the laws and regulations related to the administration of the Medicare and Medicaid programs.

4. The information contained in this affidavit is based upon my personal knowledge and my review of documents and records gathered during the course of this investigation, as well as information obtained, directly or indirectly, from other sources and agents, including information provided to me by witnesses who participated in conversations with the defendant. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others

are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW OF THE SCHEME

5. I have been involved in an investigation by the FBI and the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") of a health care fraud scheme orchestrated by SAJID JAVED, the defendant. As detailed below, JAVED, while owning and operating several pharmacies in Brooklyn and Queens, New York, has conducted a multimillion dollar scheme to defraud Medicare and Medicaid programs by seeking reimbursement for prescription drugs that were not distributed to customers. Specifically, JAVED has engaged in a scheme to obtain prescriptions for medications, for which he has billed and received reimbursement from Medicare and Medicaid, but which he has not actually dispensed to customers. From in or about January 2013 through in or about December 2014, JAVED obtained more than $8.5 million in reimbursements from Medicare and Medicaid for prescription drugs that his pharmacies never actually dispensed. JAVED has defrauded Medicare and Medicaid into providing him with these reimbursements by obtaining prescriptions from other individuals, who are willing to forego delivery of the medications in exchange for a share of the reimbursed proceeds, in the form of kickbacks. JAVED has offered to pay and has actually paid kickbacks in furtherance of this scheme.

## BACKGROUND

6. Based on my training, experience, and familiarity with the investigation and Medicare and Medicaid programs, I know the following:

a. The Medicaid program is a federal and state health care program that provides health care benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services, is responsible for overseeing the Medicaid program in New York State. Individuals who receive benefits under Medicaid are referred to as "beneficiaries."

b. Medicaid provides coverage to its beneficiaries for prescription drugs. Medicaid beneficiaries can obtain their prescription drug benefits from pharmacies either through

"fee-for-service" enrollment, or through Medicaid Managed Care plans, which are administered by insurance companies that are paid by Medicaid.

   c. The Medicare program is a federal health care program providing benefits to persons who are over the age 65 or disabled. Medicare is also overseen by CMS. Individuals who receive benefits under Medicare are also referred to as beneficiaries.

   d. Medicare, like Medicaid, provides coverage to its beneficiaries for prescription drugs. That prescription drug coverage is provided through Medicare Part D, which is administered by insurance companies that are reimbursed by Medicare through CMS.

   e. Both Medicare and Medicaid are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

   f. When a beneficiary of Medicare or Medicaid seeks to obtain medication from a pharmacy, the pharmacy provides the medication to the beneficiary at little or no cost to the beneficiary. The cost to the pharmacy is typically reimbursed in whole or in part by the Medicaid and Medicare programs. Moreover, in the normal course, pharmacies bill Medicaid and Medicare for prescription drugs that the pharmacies have purchased from licensed wholesalers.

### JAVED'S SCHEMES TO DEFRAUD MEDICAID AND MEDICARE AND TO PAY ILLEGAL KICKBACKS

   7. Based on my review of publicly available records, I know that between in or about January 2013 and in or about July 2015, SAJID JAVED, the defendant, was the owner of nine different pharmacies, located in Brooklyn and Queens, New York.

4

8.     As part of the investigation of SAJID JAVED, the defendant, the FBI has utilized a cooperating witness (the "CW").[1] The CW currently works at a pharmacy located in Brooklyn, New York, which is in the same geographic area as at least one of JAVED's pharmacies.  The CW had previously participated in a separate but similar scheme to defraud health care programs by obtaining prescriptions that were billed to Medicare and Medicaid but not actually filled.

9.     The CW has informed the FBI, among other things, that: (a) the CW had a pre-existing relationship with JAVED; (b) the CW knew JAVED to own several pharmacies, including a particular pharmacy located in Brooklyn, New York (the "Pharmacy"); and (c) the CW believed that JAVED was engaged in an ongoing scheme to defraud Medicare and Medicaid, as part of which JAVED billed Medicare and Medicaid for prescriptions that JAVED never filled, and paid kickbacks to beneficiaries who provided JAVED with the prescriptions necessary to bill Medicare and Medicaid.

### Meeting on January 20, 2015

10.    On or about January 20, 2015, at the direction of law enforcement, the CW met with SAJID JAVED, the defendant, at a restaurant in Brooklyn, New York.  At the direction of law enforcement, the CW was equipped with an audio and video recording device, and law enforcement agents, including myself, conducted surveillance of the meeting.  Following the meeting, I listened to the recording, the majority of which was in English and portions of which were in Russian.  From my review of the recording, and from

---

[1] The CW is currently facing federal charges for his participation in a scheme to defraud a health care benefit program, in violation of Title 18, United States Code, Sections 1347 and 2, and for soliciting and receiving illegal remuneration, in the form of kickbacks and bribes, in exchange for referring individuals to persons for the furnishing of prescriptions that were reimbursable by Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b.  The CW has been cooperating with the Government in this investigation in the hope of entering a cooperating agreement with the Government and obtaining a more lenient sentence.  The information provided by the CW during the course of this investigation has proven to be reliable and corroborated by other evidence.

speaking with the CW about the meeting, I have learned that during the meeting, the following occurred, in substance and in part:

      a.    The CW, at the direction of law enforcement, told JAVED that the CW had "four or five customers," meaning Medicaid beneficiaries who would agree to provide prescriptions to JAVED in exchange for kickback payments, who were prepared to switch from another pharmacy and begin working with JAVED at the Pharmacy. JAVED asked the CW, "what do you give them?", i.e., what percentage did the beneficiaries referred by the CW expect to be paid for their involvement in the scheme. The CW responded that the "customers" could be paid "20 to 30 percent," meaning 20 to 30 percent of the amount reimbursed by Medicaid to JAVED for the prescriptions. JAVED asked the CW whether the beneficiaries "get something or no," i.e., whether the beneficiaries expected to receive the prescribed medications on certain occasions. The CW responded that JAVED could do what he wanted, for example, that JAVED could make the beneficiaries take the medication one month, and then "leave" the medication, i.e., not dispense the medication to the beneficiaries, in another month. The CW further stated to JAVED that the "customers" were "very good," and had been coming to the CW for 20 years.

      b.    At a later point in the meeting, JAVED again asked the CW about how much JAVED would have to pay the "customers" referred to JAVED by the CW. The CW responded that some of the beneficiaries would accept "credit," meaning store credit at the Pharmacy, while others wanted cash kickbacks of approximately "20 to 30 percent."

      c.    The CW claimed that the CW had three or four "customers" who were HIV patients.[2] JAVED asked whether or not those beneficiaries actually received their HIV medication. The CW responded that those "customers" sometimes requested that the prescriptions be filled, and other times obtained medication samples from their doctors in lieu of the prescribed medication, meaning that the prescriptions would not need to be dispensed to the beneficiaries.

      d.    Near the conclusion of the meeting, the CW asked JAVED how much JAVED was giving his "customers." JAVED responded that the CW should tell JAVED how much JAVED should pay the "customers"

---

[2] Based on my experience in this and other health care fraud investigations, I am aware that Medicare and Medicaid reimbursement rates for HIV medications are very high, and that those individuals engaged in fraud schemes therefore frequently target HIV medications as part of such schemes.

6

referred by the CW.  The CW responded that the "customers" would be happy with 25 or 30 percent, meaning a kickback rate of 25 to 30 percent of the amount reimbursed by their health care programs.  JAVED state, "I believe 25 is good," to which the CW responded, "I'll tell them, don't worry."

                e.    At the conclusion of the meeting, JAVED told the CW, "Thank you very much for remembering me.  I really appreciate it."

### Meeting on March 19, 2015

          11.  On or about March 19, 2015, at the direction of law enforcement, the CW again met with SAJID JAVED, the defendant, at the Pharmacy in Brooklyn, New York.  Prior to the meeting, law enforcement provided the CW with patient profiles for three different Medicaid beneficiaries, including copies of their Medicaid cards, along with 10 prescriptions forms for various drugs in the names of the three Medicaid beneficiaries.  At the direction of law enforcement, the CW was equipped with an audio and video recording device during the meeting, and law enforcement agents, including myself, conducted surveillance of the meeting.  Following the meeting, I listened to the recording, and I also reviewed a transcript of the recording.  From my review of the recording and transcript, and from speaking with the CW about the meeting, I have learned that during the meeting, the following occurred, in substance and in part:

                a.    The CW provided JAVED with patient profile information for the three Medicaid beneficiaries, including copies of their Medicaid benefit cards, along with the above-described ten prescription forms in the names of the three beneficiaries.  Specifically, the prescription forms were written for: (i) "Dexilant," an acid reflux medication, in the name of an individual ("Individual-1"); (ii) "Janumet," a diabetes medication, in the name of Individual-1; (iii) "Atripla," an HIV medication, in the name of Individual-1; (iv) acetylsalicylic acid, an analgesic medication also known as aspirin, in the name of Individual-1; (v) "Complera," an HIV medication, in the name of a second individual ("Individual-2"); (vi) "Lovaza," a cholesterol medication, in the name of Individual-2; (vii) "Lidocaine" ointment, a topical analgesic medication, in the name of Individual-2; (viii) "Bactrim" sulfamethoxazole/trimethoprim, an antibiotic medication, in the name of Individual-2; (ix) Atripla in the name of a third individual ("Individual-3"); and (x) "Solaraze" diclofenac gel, a topical analgesic and anti-inflammatory medication, in the name of Individual-3.  Each of the 10 prescription forms specified that the

7

prescription could be refilled three times. The Medicaid benefit cards for Individual-1 and Individual-2 showed that Individual-1 and Individual-2 were insured by a particular Medicaid Managed Care plan ("Medicaid Insurer-1"), which is a real company located in the Bronx, New York. The Medicaid benefit card for Individual-3 showed that Individual-3 was insured by a different Medicaid Managed Care plan ("Medicaid Insurer-2"), which is a real company located in the Queens, New York.

b.  During the meeting between the CW and JAVED, the CW suggested that JAVED should "leave," i.e., not dispense, several of the medications specified in the prescription forms. JAVED indicated that he understood, and stated that he could "leave" certain of the medications.

c.  During the meeting, JAVED provided the CW with cash, as payment to one of the beneficiaries for certain prescriptions which JAVED did not fill. The CW stated to JAVED, "It's like 25 percent right? What is it? I don't know, you want to count it, or?" JAVED responded, "It's OK, later on I can . . . I will make him happy," meaning that JAVED would pay a good rate to the beneficiary. JAVED subsequently instructed the CW to "give him hundred forty," i.e., to provide a $140 kickback to Individual-1, whose prescriptions for Dexilant and Janumet were not filled by JAVED. The CW stated to JAVED that the CW would give the $140 in cash to Individual-1.

d.  During the meeting, SAJID JAVED, the defendant, dispensed the following medications to the CW: (i) one bottle containing 30 tablets of aspirin and one bottle containing 30 tablets of Atripla, both prescribed to Individual-1; (ii) one bottle containing 30 tablets of sulfamethoxazole/trimethoprim (Bactrim) and one bottle containing 30 tablets of Complera, both prescribed to Individual-2; and (iii) one bottle containing 30 tablets of Atripla and prescribed to Individual-3. JAVED did not dispense medications in connection with the Dexilant and Janumet prescriptions in the name of Individual-1. Nor did JAVED dispense medications in connection with the Lovaza or Lidocaine ointment prescriptions in the name of Individual-2 or the diclofenac (Solaraze) gel prescription in the name of Individual-3.

12.  Immediately following the March 19, 2015 meeting, I met with the CW, and the CW provided me with the above-described prescription bottles and the $140 in cash that the CW had received from SAJID JAVED, the defendant.

13. Based on my review of billing records, I know that following the March 19, 2015 meeting, SAJID JAVED, the defendant, billed Medicaid Insurer-1 for the prescriptions in the names of Individual-1 and Individual-2,[3] and Medicaid Insurer-2 for the prescriptions in the name of Individual-3, including the prescriptions for Dexilant, Janumet, Lovaza, Lidocaine ointment, and diclofenac (Solaraze) gel, which JAVED did not dispense to the CW.

Meeting on April 23, 2015

14. On or about April 23, 2015, at the direction of law enforcement, the CW had another meeting with SAJID JAVED, the defendant, at the Pharmacy in Brooklyn, New York. The purpose of the meeting was for the CW to collect kickback money and certain dispensed medications from JAVED, in connection with refills for several of the above-described prescriptions in the names of Individual-1 and Individual-2. At the direction of law enforcement, the CW was equipped with an audio and video recording device, and law enforcement agents, including myself, conducted surveillance of the meeting. Following the meeting, I listened to the recording. From my review of the recording, and from speaking with the CW about the meeting, I have learned that during the meeting, the following occurred, in substance and in part:

      a. The CW asked if JAVED signed for the prescription refills in the names of the beneficiaries, and JAVED stated that JAVED signed everything himself.

      b. The CW then discussed with JAVED the possibility of "leaving," i.e., not dispensing medication, in connection with an Atripla prescription refill. JAVED responded that doing so would be "expensive," and asked the CW how much the beneficiary would want in return for "leaving" the Atripla prescription refill. The CW replied $400 to $500. JAVED reiterated his concern about the expense,

---

[3] Billing records show that a claim related to just one of these prescriptions – the Lidocaine ointment prescription for Individual-2 – was rejected by Medicaid Insurer-1. Moreover, I am informed by a special agent with HHS-OIG (the "HHS-OIG Agent"), that the HHS-OIG Agent communicated with a representative ("Representative-1") of a company that has contracted with Medicaid Insurer-1 to assist with the Medicaid claims billing and payment process. Representative-1 informed the HHS-OIG Agent that when pharmacies bill Medicaid Insurer-1, the claims are submitted to Medicaid Insurer-1's server in the Bronx, New York.

and the CW responded that JAVED could pay the beneficiary $200 or $300 instead. JAVED responded, "We usually give 10 to 15 percent because they are HIV patients." JAVED ultimately agreed to pay a cash kickback of $200 to the beneficiary for the Atripla prescription refill, and an additional $140 for Dexilant and Janumet prescription refills. During the meeting, JAVED provided the CW with a total of $340 in cash.

        c. Near the conclusion of the meeting, JAVED stated to the CW, "One of my friends got audited by CVS Caremark and they tried to take $578,000. These times are tricky. You need to be careful."

        15. During the meeting, SAJID JAVED, the defendant, dispensed the following medications to the CW: (i) one refill bottle containing 30 tablets of aspirin, prescribed to Individual-1; and (ii) one refill bottle containing 30 tablets of sulfamethoxazole/trimethoprim (Bactrim), one refill bottle containing 30 tablets of Complera, and one refill bottle containing 120 capsules of Lovaza, all prescribed to Individual-2. JAVED did not dispense medications in connection with the Atripla, Dexilant, and Janumet refill prescriptions in the name of Individual-1.

        16. Immediately following the April 23, 2015 meeting, I met with the CW, and the CW provided me with the above-described prescription refill bottles and the $340 in cash that the CW had received from SAJID JAVED, the defendant.

        17. Based on my review of billing records, I know that following the April 23, 2015 meeting, SAJID JAVED, the defendant, billed Medicaid Insurer-1 for the prescription refills in the names of Individual-1 and Individual-2, including the prescription refills for Atripla, Dexilant, and Janumet, which JAVED did not dispense to the CW.

Subsequent Billing for Undispensed Prescription Refills

        18. Based on my review of billing records, I have learned, among other things, that:

        a. On or about May 11, 2015, SAJID JAVED, the defendant, billed Medicaid Insurer-1 for prescription refills for Atripla, Dexilant, Janumet, and aspirin in the name of Individual-1, and prescription refills for Complera, Lovaza, and

sulfamethoxazole/trimethoprim (Bactrim) in the name of Individual-2. JAVED did not dispense any of these medications to the CW.

        b.    On or about July 17, 2015, JAVED billed Medicaid Insurer-1 for prescription refills for Atripla, Janumet, and aspirin in the name of Individual-1, none of which were dispensed to the CW.

### Analysis of JAVED's Billing and Purchasing Records

        19.    I have reviewed the Medicare and Medicaid billing records of SAJID JAVED, the defendant, for the Pharmacy and certain other pharmacies owned by JAVED for the period from in or about January 2013 through in or about December 2014. I have compared those billing records with the records of JAVED's pharmacies' prescription drug purchases for the same time period, which I obtained from the licensed wholesalers who sell medications to JAVED's pharmacies.[4] In comparing JAVED's pharmacies' billing records for this time period to the records of his pharmacies' purchases, I have learned that JAVED billed Medicare and Medicaid for far more units of medication than his pharmacies actually purchased from licensed wholesalers.

        a.    For instance, during this time period, JAVED billed Medicare and Medicaid for approximately 567,360 units of Lovaza, but JAVED purchased only approximately 411,000 units of Lovaza.

        b.    Similarly, JAVED billed Medicare and Medicaid for approximately 81,585 units of Dexilant, but JAVED purchased only approximately 75,060 units of Dexilant.

        c.    In addition, JAVED billed Medicare and Medicaid for approximately 1,424 units of Lidocaine ointment, but JAVED purchased only approximately 1,122 units of Lidocaine ointment.

        d.    Moreover, JAVED billed Medicare and Medicaid for approximately 713 units of Solaraze diclofenac gel, but JAVED purchased only approximately 311 units of Solaraze diclofenac gel.

---

[4] I identified the licensed wholesalers that supplied medications to JAVED's pharmacies by reviewing bank records for business accounts associated with JAVED's pharmacies, to determine which licensed wholesalers were paid for purchases of medications.

20. Based on my comparison of these records, moreover, I believe that SAJID JAVED, the defendant, has caused significant losses to Medicare and Medicaid by billing for prescription drugs that his pharmacies never ordered or distributed to patients. Specifically, I estimate that during the time period from in or about January 2013 through in or about December 2014, JAVED caused over $8.5 million in losses to Medicare and Medicaid in the form of reimbursements for prescription drugs that he and his pharmacies did not order or dispense.

WHEREFORE, deponent respectfully requests that a warrant be issued for SAJID JAVED, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

ARTHUR LEPORE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
21st day of June, 2016

THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK